## LOCOMOBILE CO. OF AMERICA v. PARKIN.[*]

(Circuit Court of Appeals, Third Circuit. January 31, 1916. On Petition for Reargument, April 14, 1916.)

No. 2060.

PATENTS ⟨⟩328—INVENTION—CARBURETER.

    The Parkin patents, No. 968,597, for a carbureter, and No. 1,082,762, for an improvement thereon, *held* void for lack of invention, in view of the prior art.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suit in equity by Joseph W. Parkin against the Locomobile Company of America. Decree for complainant, and defendant appeals. Reversed.

For opinion below, see 226 Fed. 800.

Fraley & Paul, of Philadelphia, Pa. (Emery, Booth, Janney, & Varney, Frederick L. Emery and Edward G. Curtis, all of Boston, Mass., of counsel), for appellant.

Synnestvedt, Bradley, Lechner & Fowkes, of Philadelphia, Pa. (Paul Synnestvedt and Harvey L. Lechner, both of Pittsburgh, Pa., of counsel), for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below Joseph W. Parkin, the grantee of patent No. 968,597, dated August 20, 1910, for a carbureter, and of No. 1,082,762, issued to him December 30, 1913, also for a carbureter, filed a bill and charged the Locomobile Company of America with infringement thereof. On final hearing the court, in an opinion reported at 226 Fed. 800, held infringement was sustained. On entry of decree, the Locomobile Company took this appeal.

The motive power of an automobile is an engine actuated by an explosive mixture of air and gasoline drawn into, compressed, and ignited in a cylinder. A carbureter regulates the proportions of air and gasoline constituting such mixture. These proportions vary under changing operative conditions. In the carbureter is a mixing chamber, with both air and gasoline inlets. The gasoline enters the chamber through the small inlet nozzle, and is kept substantially at the level of the nozzle by a float valve. As the engine operates, it causes a suction which draws air through the air inlet and past the gasoline nozzle. This passing air raises the gasoline from the nozzle into the mixing chamber in the same way a throat or nasal atomizer sprays liquid when its bulb is pressed. This mixture is rich in gasoline, and is suitable

for starting an engine. But, when the engine is at high sustained speed and its parts heated, less gasoline is needed, for it has been found that, after the engine has been started with the gasoline-rich mixture, higher speed and less deposit of carbon result from an air-rich, gasoline-lean mixture. In other words, under sustained speed conditions it is desirable to reduce gasoline and increase air in the mixture. To provide this additional air, a carbureter has an auxiliary intake provided with a spring-controlled, normally closed valve. As the engine gets under way, this valve opens under the increased suction caused by the rapidly reciprocating pistons, more air is drawn into the mixture, and its gasoline richness is reduced. As the engine speeds up, the air valve opens wider, owing to the valve-controlling springs being so proportioned and adjusted that the valve automatically maintains a proper feeding capacity, due to the balance between engine suction and spring resistance. But not only does the speed of the engine call for change in the mixture, but varying atmospheric conditions as well— cold or damp weather requiring gasoline richness, while warm or dry weather calls for air richness. These and various other conditions, such as different types of engine and their valves, create varying conditions which necessitate varying mixtures.

Turning to the art prior to the patents in suit, we take the Packard carbureter, shown in the accompanying figure, to show how this auxiliary air inlet apparatus was automatically regulated. In this figure 21 is the valve and 21ᵃ is its stem. Surrounding that stem is the light-tensioned exterior spring 25 which is seated at its lower end on the collar 26ᵃ, which latter is adapted to slide on stem 21ᵃ.

The upper end of the spring normally rests against stem cap 32, and its fixed tension can be changed by the nut on the head of the stem. The low-tensioned spring 25 is initially adjusted so as to properly control the valve when the engine is started. When the machine is running at its lower speed, this spring controls valve 21, and as speed is gradually developed the increasing cylinder suction draws the valve 21 down and puts more air in the mixture. The valve thus dropping and pulling down stem 21ᵃ through collar 26ᵃ, causes light-tension spring 25 to tighten, and as it tightens its tension tends to pull up the valve. It will thus be seen that the outer or light-tensioned spring 25 can be initially and pre-operatively shop-adjusted by the stem nut, when such pre-operative adjustment is desired,

Fig. 3.

and it will also be noted that during operative conditions, and when the engine is starting, idling, or running at lower speed, this light-tension spring, by the action of the engine, is automatically adjusted to such higher or lower tension as properly regulates the valve to pass the needed proportion of air. It will likewise be observed that the device also contains means for operatively adjusting the tension of this spring. This is done by inserting or withdrawing the wedge-shaped member $29^a$, whose mechanical operation, it will be observed, is precisely that caused by the movement of the valve, viz., if pushed in it lessens the distance between cap $32$ and collar $26^a$, and tenses light-tension spring $25$. It is the same thing that is done by valve $21$, when it is drawn down by suction. It will thus be seen that the Packard wedge serves during the original starting, idling, and low speeding of the engine to adjust and regulate the light-tension spring $25$, and that during those times that spring, in connection with suction, controls and regulates the movement of valve $21$. We here call attention to this fact, viz., the complete, independent, operative control of light-tension spring $25$ by the thinner end of the Packard wedge, as one of special significance with relation to the operation of Parkin's device.

Turning from this operative low speed period, when the light-tension spring dominates the valve, we pass on to an operative condition when the engine's speed increases. Nested within the light-tension spring $25$ and encircling stem $21^a$, is the high-tension spring $31$. This spring is normally under no pressure, and it only comes under pressure when the high speed of the engine draws down valve $21$ and stem cap $32$, so that cap $32$ engages the upper end of spring $31$. It will thus be seen its function is to dominate valve $21$ when the engine is running at high speed. When such dominating function comes into play by the cap and spring top engaging, the tension of such high-tension spring may be still further increased by the use of the thicker end of the Packard wedge. When that end of the wedge is used under such high speed conditions, it is apparent that the wedge effects a dual and conjoint adjustment of both light and heavy tension springs, instead of the single, independent, light-tension spring adjustment when the engine was running at low speed. But, even so, such increase of tension as the light spring is given must in the nature of things be of relatively small moment, since the like stem shortening to which both springs are subjected must necessarily impart more tension proportionately to the stronger than to the weaker spring. Be that as it may, it necessarily follows that, as the high-tension inner spring dominates the valve at high engine speed, and the low-tension spring's effect is negligible, it would seem that a wedge action, which further increases such dominating power in the high-tension spring, may for practical and operative purpose be regarded as effecting an actual independent adjustment of the low-tension spring under low speed operative conditions, and a practically independent adjustment of the high-tension spring under high speed operative conditions.

In this state of the art, Parkin devised the spring adjustment shown in the accompanying figures:

Fig. 2.

When the machine is in use the outer or light-tension spring *28* and the inner or high-tension spring *26* of Parkin's device operate in precisely the same way as the same two springs in the Packard device, to automatically control the air valve. The outer or light-tension spring dominates during low speed, and the inner or high-tension dominates high speed operation. Thus the specification says:

"During the operation of the engine, the greater the speed thereof, the greater is the tendency of the piston to create a vacuum in the cylinder in drawing in the explosive charge, and therefore, in order to preserve as nearly as possible the proper proportion of mixture of vaporized oil and air, the two springs *26* and *28* are provided, which may be adjusted to vary the spring pressure acting upon the valve *20* to hold it against its seat. That is to say, if it be desired to run the engine at a *slow speed*, the arm *29* will be adjusted to the low part of the cam *30* to move the spring *26* out of engagement with the head *23*, and the arm *29* will be adjusted upon the cam *32* to a position in which it will cause the *spring 28* to exert the proper amount of pressure upon the valve *20* to produce the proper explosive mixture for the desired speed of the engine. When, however, it is desired to run the engine at high speed, the arm *29* is adjusted in respect to the cam *30* not only to bring the spring *26* into engagement with the head *23a* but also to bring it into engagement with the head with sufficient pressure which, *in conjunction with the pressure of the*

*spring 28*, will resist the tendency to open the valve *20* sufficiently to prevent the engine at high speed from drawing an excess amount of air into the explosive mixture through the valve opening *14*. It will thus be seen that by the employment of the springs *26* and *28*, and their coacting parts, a wide range of adjustment of the pressure against the valve *20* is obtained, and that the arm *29* may be adjusted upon the cam *30* to provide the required pressure for the desired high speed, and the arm *31* is adjusted in respect to the cam *32* to produce the required pressure for the desired low speed."

It will thus be seen that the only difference consists in Parkin's adjustment cam *29*, which adjusts low-tension spring *28*, and arm *29*, which adjusts high-tension spring *26*. These arms do adjust the springs separately and independently, and such independent adjustment is the only element in combination which differentiates Parkin's device from Packard's. The case, therefore, narrows down to the question whether this difference constitutes invention. We are satisfied it does not. As we have already seen, when the engine is run at low speed Packard, by the use of the forward end of his wedge, adjusted his low tension spring independently by pushing the inclined plane of the spring so as to force the spring top against the stem ahead, and thus increase tension. In the same way, by withdrawing the wedge, he lowered tension. By use of similar mechanical means, to wit, the inclined surface of a cam, Parkin lessened or increased the tension of his low-tension spring, while his engine was running at low speed, as will be seen by the extract quoted above. It is manifest, therefore, that no invention was involved in the slight mechanical change incident to this change, or in installing a similar cam and arm to increase or lessen the tension of the high-tension spring. Whatever advantage accrued from the change, we are of opinion that it did not involve invention and the claims in issue, 1, 2, 3, 4, and 5, are invalid. Such being the case, it follows that patent No. 1,082,762 which was an improvement based and dependent on the first patent, and which simply consisted in controlling the adjustment from the operator's seat, is equally lacking in invention.

The decree below is therefore reversed, and the cause will be remanded, with instructions to dismiss the bill.

## On Petition for Reargument.

PER CURIAM. We have carefully re-examined this case, and are satisfied the court thoroughly grasped the pertinent and controlling facts, and that the decision was right. We are further of opinion no different conclusion would have been reached, had the alleged newly discovered evidence been before us.

The petition for reargument, as well as the petition for leave to apply to the District Court for leave to take further testimony, are therefore denied.